lost, you get to start. So here I am. May it please the Court, my name is Sherry McCracken and I represent David Dellettoso in this matter. My client is here with me today. In opening, I want to remind this Court that summary judgment under Title VII is not supported because this Court and many others have found that the elusive factual question that results in a finding of potential discrimination is one that is best left to the jury, as is viewing the record as a whole. Mr. Dellettoso, as we go through this case in its black and white, as you will see from the facts and if no doubt seen from the briefing, has not been disciplined in a good career with the United States Postal Service over 20 years. Mr. Dellettoso is in senior management at the General Mail Facility, or the plants, in Phoenix, Arizona. Mr. Currie was his direct supervisor and Mr. Harris, whose name is throughout the brief, was the general plant manager and in charge of all of the plants in the state of Arizona. What relief is he seeking in this case? He is... Or is it very complicated? Your Honor, I mean, before this Court... I mean, if he wins, what does he get? If he prevails in this case, we hope that he ends up with a level 25 for lack of promotions over the last 10 years, that he ends up with emotional distress damages, and that he ends up with attorney's fees. What level is he at now? He is a level 23 at this time, Your Honor. He wants to be a 25. Yes. And he has not been interviewed for an upward promotion in something like 10 years. As you know, this fact situation arose out of an allegation of sexual harassment by Mr. De La Tosa in 1996, and he has successfully defended himself against that allegation. The Postal Service investigated it six times. The jury, as you know, is able to decide, intentional discrimination, if what it is own standards and practices, when the employer's story changes over and over again. Here, that would mean missing documents, such as Mr. Carey's initial management inquiry, where the notes were lost, such as what we call the second investigation, where the investigator testified that it was supposed to remain forever, and it obviously on its face, the copy we have, it has things after the date of the investigation in it. The jury is entitled to make decisions on issues of credibility, and in this particular case, Mr. Garrison, who was the head of human resources in the Arizona cluster, was found to have lied and perjured himself by an administrative law judge in the same hearing where the United States Postal Service knew were unsubstantiated allegations. The district court here chose one conflicting story over another, made credibility determinations, weighed evidence, drew inferences in favor of the United States Postal Service, failed to review the matter as a whole, and found incorrect facts upon which it based its decision. And, we submit that the district court ignored the Postal Service's burden of establishing the absence of a genuine issue of material fact in order to have summary judgment granted. The inferences drawn in favor of the Postal Service were that the 1996 allegations could be used to put Mr. De La Tosa on leave for allegations in November of 2002, except that he wasn't put on leave for sexual harassment allegations in November of 2002. At that point in time, Ms. Lopez is the protagonist at this point, and Mr. De La Tosa has gone to Mr. Carey and said, I can't take it anymore. You've got to make her stop. The Postal Service management was well aware of Ms. Lopez's mental state, Ms. Lopez's propensity for violence, and that she had been continually harassing Mr. De La Tosa. Mr. Carey knew, MDO Weaver knew who was a peer, and NCHED and Human Resources not only knew, but had given advice. None of these Postal Service managers ever undertook to stop this harassment. None of them turned it in. None of them called Ms. Lopez in to talk to her. Yet now we are told that the United States Postal Service thinks that Mr. De La Tosa acted wrongly in not disciplining Ms. Lopez himself for her continued harassing calls to him. Okay. Is that the most egregious conduct on the part of the Postal Service that has to do with Lopez's situation and her? She called him a lot of times on the phone. Is that what it was? She called him lots of times on the phone. She also was alleged to have stabbed two romantic interests with screwdrivers. I think the most egregious behavior by the Postal Service is actually later. Mr. De La Tosa complains that he's being harassed by this woman. The management inquiry, Mr. Carey decides that she's lying, that he's heard the calls himself, and that Mr. De La Tosa has been a harassed, that Ms. Lopez has not been a harassed, and by the time of that first management inquiry, Ms. Lopez is saying, well, no, it's not really that he harassed me. We had consensual sex once. And Mr. Carey has decided that that is untrue also. Despite this, and unknown to Mr. De La Tosa for a period of time, Mr. Garrison, the head of Human Resources, orders a second investigation. And the investigation isn't of, he said, she said, who harassed whom. The investigation is solely about Ms. Lopez's defensive allegations against Mr. De La Tosa. And we submit that that's the first retaliatory act that we see after protected activity in this line of cases. And at that point I will refer, if I can, to Ms. Lopez. I'm having an awful hard time to say that. I'm sorry, Your Honor. I just liked it better in color. It is ER-171, and it goes forward from there. The, and it's a color-coded chart. The red is retaliation. The blue is protected activity. And the yellow and green at the bottom are what Mr. Lopez, excuse me, Ms. Lopez, and then Mr. Leist said from time to time. Is the claim about this Lopez incident, the fact that he reported it and then they retaliated against him by investigating the matter? Is that what, is that what? That's correct, Your Honor, and then it gets worse. Okay. But he kept his job. He kept his job. Okay. He was on administrative leave for nine and a half months. Did he get his money, his salary at that time? He was on paid administrative leave. Administrative leave in the Postal Service is paid. That's paid. And we So he didn't lose any money. He didn't lose money. He got to go home and draw his pay. Well, and worry about having a job. Right. But I mean, he still had a job and getting his pay. Right. And that's the reason we're not asking for any money except for the money of the bonus that he didn't receive because of their actions, and they simply said that he didn't receive his bonus because he wasn't there, although his group did extremely well and he had set that in place to start with. Anyway, back to the more retaliation. The second investigation is closing up, January 9th. The investigators have called Mr. Garrison and told him that they're ready to go home, that Ms. Lopez has absolutely recanted all of her allegations, that there's no second sexual harassment, that there's nothing to investigate. Mr. Garrison, the head of Human Resources, calls them urgently that evening and says, you have to come interview Mr. Leist. You've got to come interview Mr. Leist. So they go and they interview Mr. Leist. Then things get murkier and more obscure. Tell us who Mr. Leist is again. Mr. Leist is allegedly a romantic interest of Lopez who says that he was being harassed by De La Tosso and feared retaliation from De La Tosso and feared for his life from Ms. Lopez. He also reported that she had attempted to attack him with a screwdriver. So he was scared of her and your client both? Well, our position is, is that the investigator says that he was never physically afraid of my client. He says that my client, if you read it, looked at him funny. The general mail facility, Your Honor, has aisles that are wider than your bench, and Mr. De La Tosso supervises between 500 and 800 people on machines that are about as big as the panels behind your bench. And Mr. Leist admitted in his deposition that until that day he had never spoken to Mr. De La Tosso. There were two levels of management between Mr. De La Tosso and Leist. Anyway, somehow Mr. Carey is told he is supposed to put De La Tosso on leave. He testifies that he objected. He testifies that he finally thought it was because Lopez was a danger to herself and others. He testifies that he's given a set of letters by Mr. Harris that originally says for impeding a sexual harassment investigation for Mr. De La Tosso, and says for Ms. Lopez she's a danger to herself and others. Mr. Harris angrily pulls them back, says something to the effect that human resources can't do anything right, and replaces them with ones that say that Mr. De La Tosso and Ms. Lopez are now being put on administrative leave for sexual harassment. This makes no sense. Now the district court would have us believe that it was rational and reasonable, based on a 1996 allegation that was unsubstantiated, which the Postal Service settled, which means nothing to us, to investigate Ms. Lopez's sexual harassment complaint for nine-and-a-half months with Mr. De La Tosso on leave. However, from November 1st until January 9th, Mr. De La Tosso and Ms. Lopez worked in the Phoenix facility. She was sent to Rio Salado. Mr. Carey says that the practice in the Postal Service in Phoenix was to put parties in separate places and not to put them on administrative leave. Mr. De La Tosso, according to his peers, was the first one that was put on administrative leave for any period of time because of sexual harassment. She was transferred and he was put on administrative leave at the same time? Yes. Actually, she asked to be transferred. How far away is that from the Phoenix station? About a mile. One is at 44th and Van Buren, and one is at something like 35th and Buckeye, so it's a couple of miles, and it was her choice. You know, they would have moved him otherwise, I assume. Mr. De La Tosso is on administrative leave. Ms. Lopez is returned to work four-and-a-half months later, and by January 27th there are no allegations of Ms. Lopez to investigate against Mr. De La Tosso. The least allegations we submit disappeared basically by February 11th, when the union was told that Mr. De La Tosso had done nothing to harass Mr. Least. The Postal Service, during the nine-and-a-half months that Mr. De La Tosso is on leave, during three investigations, three of which were after Mr. Least's allegations, never asked Ms. Lopez if the allegations that Mr. Least had put in his tirade were true. In her deposition in 2005, when we went through those allegations and what she allegedly told Least, she said they weren't true, that she hadn't told him those things, that she wasn't afraid, et cetera, et cetera, et cetera. By the end of the second investigation by Mr. Graves, we are left with one question. It looks like nobody is investigating sexual harassment. Their one question is, did Mr. De La Tosso lie to a USPS investigator about one incident of sexual of consensual sexual conduct with Ms. Lopez? That investigation goes on for the next eight months. And it's here where the court weighed the credibility and didn't leave things open for the jury. Ms. Lopez isn't credible. Ms. Lopez attacked two romantic interests with screwdrivers, and the Postal Service knew it. Ms. Lopez had been telling people that she was sleeping with managers of distribution operations during the year 2001. Kraft employees had complained, and nothing was done. Ms. Lopez was found before the end of Carey's management inquiry in four separate lies. Mr. Leist was a poor employee. He had been, if you will look at the tirade, none of the things that he complains about, none of the Mr. De La Tosso looks at me funny, is after Ms. Lopez's sexual harassment complaint. It all predates it. And the court also did not take into account nor did the Postal Service the supervisor who put Ms. Lopez on leave, saying he sent her for a fitness for duty physical because she threatened to attack the medical unit. In other words, the United States Postal Service and the district court ignored all the credibility issues by the Postal Service, weighed the credibility issues by the district court in deciding that Mr. De La Tosso was not harmed. Your Honors, what we submit here is that there's been a continuing ongoing hostile work environment on the basis of retaliation and sexual harassment of Mr. De La Tosso. What's the sexual harassment? I'm not sure. The sexual harassment, if you start in 1996, Your Honor, is he raped someone. He's a rapist, zipper one and zipper two. You mean the sexual harassment is by the management because they accepted this complaint for a period of time? Is that it? I'm not sure I follow what you're calling it. It's sexual harassment by the management because they didn't just accept it and investigate it. They told the union that he was a rapist. They called him zipper one and zipper two. Mr. Harrison's staff meetings talked about his supervisors having sex in the parking lot. And the Postal Service tells us in this briefing that the reason that they can take all of the allegations about Mr. De La Tosso and put him on administrative leave is that there were allegations unsubstantiated investigated six times in 1996, which Mr. Harris has admitted to Mr. De La Tosso that he didn't believe and that Mr. Harris has said in depositions should not have come into this matter. And the contemporary record does not show that that was the reason Mr. De La Tosso was put on administrative leave. The reason Mr. De La Tosso was put on administrative leave, no doubt, was because he named Mr. Garrison as a similarly situated individual who was not put on leave. I'll reserve my 30 seconds, Your Honor. Thank you. We'll hear from Postal Service at this time. The Postmaster General, Mr. Potter. Mr. Stutler, how are you? Good morning, Your Honors. How are you? May it please the Court, Timothy Stutler with the U.S. Attorney's Office for the Southern District of California on behalf of John Potter. This is a case that the Postal Service has struggled with since 1995. And since that time, they have proceeded very cautiously on it. It's one of the most difficult situations that an employer can find itself in. We have, on the one hand, a very good supervisor who's technically very competent. And on the other hand, in 1995, you have a low-level subordinate who has some performance problems, admittedly, who's claiming that this supervisor drugged her and then raped her in the parking lot of a local bar. Now, the case is not about whether he did this or did not do that, and we're not asserting that he did that. But the record is clear that this was alleged. So in 1996, both this first alleged victim, and this is a matter of public record, her name is Liza Starr, and Mr. Dilatoso had complaints running against each other. He didn't have a formal EEO complaint. So at that time, 1996, they put him on leave for two months. When he came back in June of 2000, excuse me, in June of 1996, Paul Harris, who is his primary antagonist throughout these proceedings, sat down with Mr. Dilatoso and expressed to him, I've got some doubts about her stories about Ms. Starr and whether or not you did these things that she claimed, but I believe that you're engaged in improper relationships with your subordinates and it's come back to bite everybody, put us all in a very bad position. Mr. Harris has consistently, from 1995, told his supervisors, I don't want you dating your subordinates. I can't tell you not to do it, but if it blows up on you, and if they later claim that you sexually harassed them or did something bad to them because of this, you're on your own and I'm going to come down on you. And that was his view on this. And after that time, after Liza Starr's allegations, Mr. Harris suspected that Mr. Dilatoso was involved in such relationships. Now, the Starr claim, that's not the subject of what this case is about now. That's correct. It's leading up to it, to the Lopez problem. That's right. That's background. There are actually three lawsuits involved in here. It is related to the extent that some of the allegations in the second complaint, the second lawsuit and the third lawsuit were knocked out based on race judicata because some of the same allegations were made in the first lawsuit that Mr. Dilatoso filed. So if we move forward a couple years, in November of 2002, Mr. Dilatoso went to his supervisor, Dave Carey. The record suggests that they had a social relationship, occasionally would go out to dinner and such. Mr. Dilatoso told Mr. Carey, I've got this woman, Ramona Lopez, and she's been calling me and harassing me basically for the last year or so. She's called me more than 100 times. She's used my wife's name when they're paging me, and I just want it to stop. I don't want her disciplined. I just want it to stop. So Mr. Carey called in Ms. Lopez. She came in with the union representative, and Ms. Lopez said, I can't believe this. He has sex with me. He's coming after me, and now I'm the one that's being yelled at. And she turned around and claimed that he's the one that's harassing me. So Mr. Carey questioned her. The record has statements from the union representative who was there who indicated she felt it was more of a cross-examination, that Mr. Carey very clearly did not believe her version of the story. So he concludes that Ramona Lopez is lying. Mr. Dilitoso is telling the truth. They got back to the region. They decided, you know, we've got a low-ranking subordinate who's claiming, just as this previous claimed victim, that this guy, the supervisor, Mr. Dilitoso, has sex with her in the parking lot of a local Phoenix bar. There's no allocation of drugging or rape here. There was no indication, and Ramona Lopez never asserted that it was anything other than consensual. But she did later claim, and through the course of this, that after this happened, he took various actions against me, admittedly fairly minor actions. He wouldn't let me go on one of these charitable, I believe it was, one of the United Way fundraisers, those sorts of things. These facts are a little bit complicated, so forgive the factual question. Let me just clear up on my own mind. At one point in time, the subordinate, Lopez, accused Mr. Dilitoso of rape. Is that right? No, Lopez never accused him of rape. That was Starr. Oh, Starr. Right. Did Starr withdraw that? That case was later settled. Did Ms. Starr ever withdraw the accusation? No. It was resolved? It was, right. She filed a lawsuit, and the case settled. Okay. And did that, the resolution of that result in any discipline or lack of promotion for either of them? For either Ms. Starr or Mr. Dilitoso? Correct. No, it did not. I believe she may have been terminated at some point. I don't believe it was related to this. For unrelated reasons. Right. A plaintiff alleges in this case that he's, that promotions have been withheld on account of his defending himself in the Starr case and his asserting his own EEO complaints. We don't agree with that, and we don't believe the evidence supports that. The next sort of factual stream is an allegation of consensual sexual relations with a subordinate. Right. And harassment by one against the other after that. Correct. Or arising out of that. That's correct. And the Postal Service investigated that to determine who was harassing who. Yes. It's a little bit more complicated than that. There were a number of investigations, as Ms. McCracken indicated. The alleged sex between Ms. Lopez and Mr. Dilitoso occurred on April 27th of 2001. Her allegation was he invited her to come there. He had a side business setting up dart boards and other machines in local bars. There was no, we're not asserting any sort of conflict with this position. So he invited her to the bar. She claims he bought her a couple drinks. And after there's mixed evidence whether she was drunk or not, but her allegation is we had sex in his car in the parking lot of this local bar. So after Mr. Carey completed his review, and this is in November of 2002, the local district decided we've got a low-ranking employee who's making a similar complaint to what we had last time, albeit without the rape allegation. We need more of an investigation. We need to put a couple of EEO investigators on this case. And they did that. The EEO investigation began in November of 2002. While this was going on, Ramona Lopez's former boyfriend, Michael Lease, came forward to the local human relations manager, and his name is Mr. Garrison, Wayne Garrison. Garrison frantically ran upstairs to where they were preparing the report and said, we've got another issue that's related to this. I'd like you to look at this. The investigators were very candid. They said, you know, we're getting ready to go home. We really didn't want to look at this, and it's not part of what we were supposed to be looking at. But because this seemed very serious, there were allegations of possible violence, harassment by Ramona Lopez, and some sort of harassment by Mr. Dilettoso, they did call Mr. Lease up with his union representative to talk to him. Mr. Lease said, Ramona Lopez has stabbed me, and this Mr. Dilettoso, I believe because of their romantic relationship, has been harassing me, asking supervisors to discipline me and just basically scrutinizing me. And I fear for my job from him. I fear for my life from Ms. Lopez. Mr. Garrison spoke with Mr. Harris. This is the same Paul Harris who I had previously spoken about. Mr. Harris was instrumental in the Starr settlement. He had written to the U.S. Attorney's Office, or the U.S. Attorney's Office, he spoke with them and said, I don't know what happened here, but this is something we need to settle. And he pushed it to settle, and it did settle. So he and his dossier immediately put both Ms. Lopez and Mr. Dilettoso on leave. One of the claims he has is, why not just put me in a different facility? The problem with that was he was so senior in the organization, there was no other place to put him without displacing somebody else. So based on all these allegations, until they could sort it out, they put them both on leave. What was this about transferring her to some other station? Was that later on? That actually happened earlier. Mr. Carey, who originally spoke with Mr. Dilettoso and interviewed Ms. Lopez, agreed with her request to send her to the Rio Salado facility. So at the time that she was put on leave and Mr. Dilettoso were put on leave, they were both working at different facilities. So they both went out on leave. The problem with the fact finding that was conducted by the two EEO folks was that their instructions were, we don't reach conclusions. We take statements and we say, this is what we've got here. So they presented the Postal Service with a series of conflicting statements without determining who is right and who is wrong. The whole packet went up to the Pacific region. Several months before this, the Phoenix region had come under the control of the San Francisco area, or the Pacific region. They looked at the packet and said, we're not satisfied with these results. We want to look at all of these events. And one of the claimed contradictions here was, why did they order this third investigation? Mr. Garrison's view was, well, we've got a possible witness tampering claim. The day after Mr. Dilettoso, excuse me, Mr. Lease came forward with his complaints, and that was January 9th of 2003, Mr. Dilettoso was supposed to be put on leave. Mr. Lease was assured that he would be gone. He would be out for several months, as would Ms. Lopez. You don't have to worry about these two. Mr. Lease got to work, and one of his coworkers came up and said, I thought Dilettoso was supposed to be on leave. He's been standing there watching you with Mr. Carey at the end of your machine, just like he's been doing for months. Mr. Lease frantically called Mr. Garrison, who called Mr. Harris, who called Mr. Carey, and they said, get him out of here. He's supposed to be on leave, and we're trying to sort these out. So Mr. Dilettoso did leave without any problems and went home and commenced his leave. So the next investigation came, and a few days later, Ms. Lopez, she recanted her allegations there was sexual harassment. She never recanted her allegation they had consensual sex, and she said, all I want to do is be able to do my work without Mr. Dilettoso, without him interfering with my job performance, and she never recanted that allegation. Mr. Lease, a couple days later, wrote a very detailed, I believe it was an eight-page letter, complete with statements from his supervisors and other coworkers, which supported his view that he was being harassed and singled out by Mr. Dilettoso. The investigators in the third investigation took a look at all of this and took a look at all of the information, and at the end of March of 2003, they sent in their report. Now, at that point, if everything was working properly, and as you would hope, both of them would be brought back to work, or at least some sort of conclusion would be made. Unfortunately, as far as this case is concerned, Mr. Harris was winding down his career with the Postal Service, and he was to go in on detail to various parts of the country and no longer be in charge of the Phoenix and Tucson areas, although I believe he nominally kept the title. They brought in a guy named Mr. DePerry. He came from the Seattle area, a much smaller post office. He was overwhelmed by the new responsibilities. It was a much bigger region. He was learning new procedures, new people, new names. Mr. Harris told them before he left, he said, you've got two issues you need to deal with. One of those is the Dilettoso issue. He's out on leave. And the other one is an issue involving a supervisor down in Tucson. So you need to deal with these and not delay on this. And that was Mr. Harris's last involvement in this. Mr. Dilettoso doesn't have a, he does not allege, I'm thinking through making sure I'm stating this accurately, that Mr. DePerry had any acts to grind with him. He'd never filed any complaints against Mr. DePerry. Mr. DePerry had never been part of this area. They were complete strangers to each other, and by all accounts, they got along pretty well. Mr. DePerry wasn't able to get to the matter until June. When he finally did look at it, his conclusion was that, I don't think there's any sexual harassment of Ramona Lopez. I don't see that here. Lease allegations, I don't think there's much of that. But I do have a problem now that one of my senior managers may have been lying to us about this sexual relationship. During the investigation, the third investigation, Ms. Lopez came forward with ATM receipts showing that she was at the bar where she claimed they had sex. Mr. Dilettoso, during that third investigation, originally said, I've got evidence, I've got proof that I was actually at a dart tournament in another part of town. But he refused to turn that evidence over. Ms. Lopez also produced her telephone records, which showed that she had many phone calls to Mr. Dilettoso's number. Most of them were only one minute or two minutes. Some of those were 15 minutes, 17 minutes, and 20 minutes. One of the phone calls that we know about was one that Mr. Cary listened to. And to paraphrase, because Mr. Dilettoso put it on the speakerphone, Mr. Dilettoso told Ms. Lopez on the speakerphone, we're not having a relationship, we never will. And she said something in effect, well, you weren't talking like that when you were taking my panties down. So if you look at the number of calls, the length of the calls, and Mr. Dilettoso's reaction, which was not to discipline her, this suggests that there was some sort of relationship, which was corroborated with circumstantial evidence of her ATM receipts, and that this also suggests that perhaps Mr. Dilettoso was lying. Now, Mr. DePerry understood he didn't have any solid evidence of that, so he brought Ms. Lopez back, but he continued Mr. Dilettoso on leave while he could continue investigating that. In September, Mr. Garrison, who was the human resources manager, asked for a comparison to be done of the Starr matter and the Lopez matter. And they concluded that there were a number of similarities. We have two very low-ranking employees, female employees, single mothers, some performance issues basically on the bubble as far as their jobs were concerned. And one of the big arguments in this case by Mr. Dilettoso is, well, you should have believed me. I'm a Starr manager, and these people, these two low-ranking employees, they've got all kinds of problems. And the problem in that case is we heard earlier this morning an argument that involved child molestation, it sounded like, and in many of these cases, harassment cases, you don't necessarily go after the strongest and most credible victims. It's like a lion would not carve out the strongest gazelle out of the herd. If you believe the allegations of Starr and Lopez, you've got a supervisor who is basically a predator who would invite them to these bars, his home turf where he worked and had machines, either apply them with alcohol or drugs and have sex with them, and afterwards when things started turning south, take action against them. Now, again, we're not saying that's what happened here, but that was a picture that was painted by these two subordinates. So the Postal Service was very cautious about this. Mr. DiPeri, by September, didn't know what to do. He asked legal counsel from San Francisco for an opinion, and they sent him one. Mr. Dilitoso claims that legal counsel encouraged them to fire Mr. Dilitoso. But if you look at the letter, that's not what happened at all. The legal counsel, we waived the attorney privilege on that, the attorney-client privilege on that, said you've got a couple options. They're all fraught with difficulties. At the very least, if you bring them back, tell them don't get yourself in these situations where you're putting the Postal Service and us at risk. And that's exactly what happened. They brought Mr. Dilitoso back to work, and that was the end of the story on that. One question, more out of curiosity than anything. Why the San Diego office of the U.S. Attorney and not Phoenix? As I understand it, the first case I believe was handled by Los Angeles, and my understanding is that was because Mr. Dilitoso's manager would be involved in assisting the U.S. Attorney's Office in Phoenix in various cases. And I think the feeling there was we worked with this guy before, and I'm not sure there was an actual conflict, but it didn't look good for them to be defending against one of his cases at that point. So the bottom line in this case is that there is no direct evidence of any sort of retaliatory or discriminatory animus. And that being the case, Mr. Dilitoso has to rely on circumstantial evidence. But he doesn't have the sort of specific and substantial circumstantial evidence that he needs to establish his case. Without such evidence, there is no issue for the jury to determine. He hasn't proven that it's more likely than not that retaliatory or discriminatory animus motivated any of the decisions here. It's all speculation. Unless the Court has any questions, I'll submit. I don't see any. Thank you very much. Thank you for your argument. Rebuttal argument, counsel. If I may, Your Honor, answer the question as to why the San Diego U.S. Attorney is here. The exact Assistant United States Attorney was assigned to Mr. Dilitoso's case who had defended him in the Starr case, and therefore we said that there was a conflict that couldn't be waived. Also, I'd like to refer the Court to ER 131, which is the innocuous letter, according to the Postal Service, where Ms. Howe put together a list of, quote, problems with Mr. Dilitoso's EEO complaints in September of 2003. The Postal Service alleges in its brief that this was not published and only to Garrison, but it's part of the regional investigation. Also, I want to make clear, it's one time of consensual sex. It's not a relationship. It's not an ongoing. The woman has only ever not recanted one. And what the date? The date came not in the management inquiry, not in the second investigation of Mr. Dilitoso's harassment of her, but in the third investigation of the regional investigator. The ATM record, I don't think it's authentic, and I think that it is redacted, so you can't tell what it is. And it's for the wrong day. The other thing that I would ask the Court to look at as far as why hasn't this been looked at, and why can there be, are ER-153 through ER-approximately 163. The United States Postal Service alleged in its summary judgment motion that Mr. Dilitoso had listed 11 reasons that he'd been discriminated against or axed. The Court narrowed those to eight. We, in responding to that question, said, look, we answered interrogatories and we listed 67. So we don't see that anybody has narrowed it. The Court said that those were vaguely written. These were interrogatories and the letter that was attached to them was written to Mr. Stutler, who had been on this case. Okay. You're almost two minutes over your time. I'm sorry, Your Honor. Thank you very much. Thank you for your argument. I thank both sides for their argument. The case just argued will be submitted for decision, and the Court will stand in recess for the day. All rise. This Court has decided that this case is adjourned. Thank you. Thank you.
judges: B. Fletcher, Siler, Hawkins